HERMENIGILE MESSIER *vs.* CORDELIA E. RAINVILLE *et al.*

JULY 8, 1909.

PRESENT: Dubois, C. J., Blodgett, Johnson, and Parkhurst, JJ.

(1) *Contracts for Testamentary Disposition.*

Contracts for testamentary disposition are allowed to stand only when established by clear proof.

As a will is ambulatory until death, an agreement relied upon to change its ambulatory nature, must be established by the most indisputable evidence and presumptions can not take the place of proof.

Evidence considered, and held not to establish a contract to make a will, nor a contract not to revoke the will, nor conduct on the part of respondent which would estop her from revoking the will.

BILL IN EQUITY to set aside a deed and mortgage, and for a reconveyance, and for relief in the nature of specific performance and for an injunction. Heard on appeal of respondents, and sustained and decree of Superior Court reversed.

JOHNSON, J. This is a suit in equity, brought in Kent county, by Hermenigile Messier against his sister, Cordelia E. Rainville, her husband, Stanislas Rainville, and his mother, Cordelia Chevalier Messier, to set aside a deed and mortgage, and for a reconveyance, and for relief in the nature of specific performance, and for an injunction.

It was alleged in the bill that on the 12th day of January 1891, the respondent Cordelia Chevalier Messier was possessed of certain real and personal estate in the town of Warwick, and that prior to that time she had agreed with the complainant, who was her son, "that she would then and there make a will, and would not revoke the same, giving him absolutely all the real and personal estate of which she should die seized or possessed, or to which she should at her death be entitled, and that he should have the use, control, and rentals of all said real estate until her death, he paying all the expenses of maintaining the same," in consideration that he " then and there promised and agreed with her that he would for and during her natural life support and take care of her, supply her with clothes, nursing, medicine, medical attendance, and all the necessities of life, and hire and pay for at his own expense a pew in the Roman Catholic Church, at said Warwick, for her use, and give her a suitable burial in a certain burial lot then and there owned and possessed by said Cordelia Chevalier Messier."

It is further alleged in the bill that the will was made in accordance with the alleged agreement, and that the complainant has since, relying upon the alleged agreement and the will, made valuable improvements on the property, and that he has managed the estate, collected the rents, paid all expenses, and supported his mother.

November 22, 1907, it is alleged, the complainant's mother

left his house and went to board with her daughter, the respondent Cordelia E. Rainville, a sister of the complainant.

It is alleged that the daughter and her husband, Stanislas Rainville, with knowledge of the alleged agreement, by undue and improper influence, persuaded the respondent Cordelia C. Messier to destroy her will, to convey her real estate to her daughter Cordelia E. Rainville, and to take a mortgage back, conditioned on proper support of the mother by the daughter.

The complainant prays "that said deed from the said Cordelia C. Messier to the said Cordelia E. Rainville, and all rights conferred thereby upon said Cordelia E. Rainville and her said husband, Stanislas Rainville, should be adjudged absolutely null and void, and of no effect, and that the said Cordelia E. Rainville, and her said husband, Stanislas Rainville, should be ordered and adjudged to convey by suitable deed all the right and interest which they now have in said real estate to the said Cordelia C. Messier, and that said agreement in the form of a mortgage from the said Cordelia E. Rainville to the said Cordelia C. Messier should be adjudged null and void, and that the said Cordelia C. Messier should be ordered and directed to hold said property and real estate subject to the terms and in accordance with the aforesaid agreement between the complainant and the said Cordelia C. Messier, and that the said Cordelia E. Rainville, Stanislas Rainville, and Cordelia C. Messier should be enjoined and restrained forever from making any conveyance or encumbrance, or doing anything whatsoever in violation of the terms of said agreement between the complainant and said Cordelia C. Messier so long as the complainant performs, or is willing to perform the terms of said agreement."

The cause was heard on bill, answer, and testimony, March 9th and 10th, 1908, before a justice of the Superior Court.

The complainant testified that he was forty years old; that he and his brothers and sisters lived at home with their mother, the respondent Cordelia C. Messier, until 1891, when he and his mother were living alone, the other children having married and left home; that in 1891 he and his mother made an agreement in writing (transcript, p. 7), which the mother called

a "testimony," which provided that "she gave him all the property she had and he was supposed to take care of her during her lifetime" (Trans. p. 6), and the mother promised not to break the agreement. It clearly appeared from the evidence (p. 13), and complainant's counsel admitted in open court (Trans. p. 7), that "whatever agreement there was, was in the form of a will;" and it appeared that a will was made by the mother, by which her property was given to the complainant (Trans. p. 213). After the execution of the will, the complainant looked after the repairs on the house and paid the taxes and water bills. He had performed these services for his mother before the making of the will, after his elder brother had left the maternal home (Trans. pp. 54–5).

In 1892 a house was built upon this land. It cost about $1,100.00, and of this amount $300.00 was provided by the respondent Cordelia C. Messier, and $600.00 was borrowed by her from the Centreville Savings Bank on the security of a mortgage made by her. The complainant looked after this matter and worked on the house, being a carpenter by trade, but he received no wages, the amount which he would have earned being credited toward the amount due on the contract. The complainant paid all but $200.00 of the amount due the bank under the mortgage, but he had the rents from the property.

The complainant was married June 17, 1901, and brought his wife to his mother's home, and the latter gave up her duties as mistress of the house. Before his marriage he gave his wages to his mother. After marriage he handled all the money. Subsequently they moved into a house owned by the complainant's wife. After living together for a number of years, until November 22, 1907, the mother left her son's house and went to the house of her daughter, the respondent Cordelia E. Rainville, and conveyed her property to her daughter, taking a mortgage back, upon condition of being properly supported and the performance of certain acts. There is evidence, also, that the will was destroyed.

The Superior Court, on the 13th day of July, 1908, entered a decree ordering the deed and mortgage set aside, and a reconveyance, on the ground of fraud.

The respondents' claim of appeal and the transcript of the evidence were duly filed, but the transcript was not allowed within the proper period, the judge who heard the case being on vacation. A petition to establish the correctness of the transcript was duly filed, and after an amendment had been made thereto the petition was granted.

Complainant testified (Trans. p. 6): "Q. Now, did you make an agreement with your mother concerning this property in 1891? A. Yes, sir. Q. You tell to the court what that agreement was. A. Well, the agreement was like this,—she give me all the property she have. Q. You just turn your fact to the court. THE COURT—You stand back to your own table, and he will likely talk toward you. WITNESS—The agreement was like this,—she give me all the property she had and I was supposed to take care of her during her lifetime; give her all the necessaries for living, and for that she would give me the property. Q. And did she put that agreement in writing, do you know? A. Yes, sir. Q. Who made the writing? A. Father Gaboury. MR. BOSS — There is no allegation that— MR. LIZOTTE—Whatever agreement there was, was in the form of a will. Q. You say the French priest living there at the time? A. Yes, sir. Q. Where is he now? A. In Wickford. Q. Did she have this will made, or agreement made in pursuance with an understanding between you two? A. Yes, sir. Q. Now, was you there when this writing was made? A. Yes, sir. Q. You was present? A. Yes, sir. Q. What was it supposed to be called? A. Called it an agreement; a bargain, I should say. Q. Was it mentioned there that it was a will or an agreement? A. Mentioned agreement. Q. An agreement. Did your mother call it anything else besides an agreement? A. Yes, mother called it a testimony, I think, or something of that kind. Q. A What? A. Testimony. Q. That is a French word for what word in English? What do we say for the word testimony? What do we call ordinarily a testimony? A. An agreement. Q. Do you know whether it is called anything else? A. No. It might be but I don't know. Q. But she called it a testimony? A. Yes. Q. After this agreement was made, or this testa-

ment was made what was done, what did you do for your mother? A. Well, I was working every day and gave her all my salary and supported her, supported the house." He further testified that he furnished her clothing, medicine, and everything she needed; that he paid for a seat for her in church; paid the church society for her; and "let the repairs on the house." When asked, "Is there anything else you did for her," he answered: "That is all I remember." He also testified that she occupied the house with him; that she kept house and did the cooking; that this continued for eleven years, until he was married; that he was married in 1901, and he and his wife and mother lived together thereafter until November 22, 1907. Later he testified on this subject (Trans. p. 12): "Q. Now when you made this agreement with her what further was said than you have told us, if anything? You said that you were supposed to take care of her during her lifetime and so on. Now, was there anything else said between you two? A. Yes, she promised me at that time she wouldn't break the agreement she had with me. Q. Did she tell you why, give you reasons why? A. No, I don't remember she tell me the reasons why."

The complainant had no prior conversation with his mother, and knew nothing about the fact that she was to make a will until the day the will was made, when she told him she was to "give him an agreement" that the property should be his.

The witness Dutilly testified (Trans. p. 81): "Q. Never mind the details. Did you have any talk with Mrs. Messier about this agreement that Mr. Messier has said he made with his mother? A. Well, she told me that she had nothing to do about doing any kind of business because she had left it all to him. Q. Well, what did she say? A. She said to me like that, that he was doing the business and she was depending on him for her living. He was the best boy of the two and she trusted him to live with him and she would give him what she had, but I don't know—she never told me she had signed any agreement or anything of the kind. Q. Said she had given him all she had? A. To support her, because she trusted him better than she could the other boy. He was the best boy of

the family. That is what she told me many a time. Q. What did she say he was supposed to do for her? A. He was supposed to support her. She didn't tell me the particulars of it. We never came as far as that, about her agreement, all those points. She told me, as I tell you, that she gave everything she had to him to be supported because he was the best boy of the family and she trusted him with it."

Aglae Martel testified (Trans. p. 85) that she had a conversation with Mrs. Messier concerning an agreement she made with her son, the complainant: "Q. And what was the agreement, did she say? A. She said that she made a will with her son and I told her she could break her will, it was not very good. She says, 'I could not break it for my son asks for his labor or his wages so I would be bad situated,' or something like that."

Exelia Duhamel testified (Trans. p. 94): "Q. Well, did you hear her say anything about an agreement that she made with her son? A. Yes, sir. Q. What was that agreement? A. She told me she gave everything to Hermenigile because she know he is a good son and she says she couldn't depend so much on the others in the family so she gave him everything belonged to her. Q. Did she tell you what he was supposed to do to her for that? A. Never had so much talking. Q. How is that? A. I say no, she never told me."

Joseph Duhamel testified (Trans. p. 92): "Q. Now, you tell the court what you heard her say about this agreement. A. Well, what I heard Mrs. Messier say in to my house, she said that she had given everything she had to her son, Hermenigile because he was the best child of the family; he was the only one that could take care of her. Hermenigile could take care of her. That is about all I could say that Mrs. Messier said."

On the motion of the complainant the testimony of Charles P. Gaboury, who drew the will, was taken in a commission issued by this court. He testified that he remembered drawing the will. As to what directions she gave him as to the will, he testified: "My impression is this,—May be twenty years ago, may be eighteen, she came to me to have a will. She

spoke to me about certain matters but I cannot swear positively of them. She said to me, for instance, 'You know that I want to give that to my son, providing he will provide for me for life.' That is my impression, see? But I cannot swear that she said it positively. I want to make a distinction between the two. I can have a general idea of the thing, but I cannot swear positively that it is so. It is so far away, that the more I think of it, you understand, the more I doubt if she said it or not. Now I knew the family well. I knew Mr. Messier well. My impression was that he was to provide for his mother and all that, but I cannot swear that she said it, that she put it in her will or she said so. It is only an impression of mine. I cannot swear to'it."

The respondent Cordelia C. Messier testifies that she made no agreement with the complainant concerning the property (Trans. p. 126), and that the complainant promised nothing in consideration that she should make the will (Trans. pp. 145 and 136). In cross-examination she testified (Trans. p. 46): "Q. At the time you made the will, when the will was made and signed, was it or not understood that you were to go home and live with your son and your son was to take care of you the rest of your life? A. I lived there. There·was no understanding that I would go and live with him because I always had. Q. Did you expect to live with him after making your will and he to take care of you? A. We were together. He cared for me and I cared for him. Q. Now, what care was he supposed to give you, what did you expect from him? A. I expected no care from him. What he did he did with good will. Q. Didn't you expect that he would have to buy you food to eat and give you a room to live in? A. No agreement whatever."

The respondent Messier made a will because Father Gaboury advised her to do so (Trans. p. 165).

There is no testimony that the complainant made any promises in consideration of the making of the will. He testified that the agreement was in writing, and his answers to the questions of counsel as to what he agreed to do refer either

to what he supposed was in a written agreement (the will) or to subsequent talks with his mother.

From the evidence it is clear that there was no agreement, either oral or written, to make a will, prior to the making thereof. Wherever in the testimony an agreement is referred to, it is clear that the reference is to the will and only to the will.

The complainant testified that the first he knew of the "agreement," as he called it, she told him of it. He also said: "Well, the very day she made that agreement, she show it to me and I read it." Elsewhere he testified that as it was in English he couldn't read it very well, and that Father Gaboury read it to him. He does testify that she promised him she wouldn't break the agreement she had with him. He also says that he did all that he did on that property in consequence of the agreement and that he would not have done what he did if he had thought his mother could change it. He did not, however, tell his mother that he would not support her unless she gave him the property. He testified that nothing was said about the rent at that time. As to the new house, when that was built, he testified that she said the rents should be his. Mrs. Messier testified that she made no agreement with the complainant concerning the property; and that the complainant promised nothing in consideration that she should make the will. The complainant did not testify to promises made by him. The most that he would say in response to the reiterated questions of his counsel was, "*I was supposed to support her.*" She did not call for any accounting, but she says she felt so sure of dying with him that she did not meddle in the business.

The complainant figures that he has paid $500.00 on the principal and $138 on the interest (Trans. p. 36). From the testimony, receipts and expenditures of the complainant, since he took charge of the property, appear to be, approximately as follows:

RECEIPTS.

| | |
|---|---:|
| Rent of new house, fifteen years | $2,430 00 |
| Rent of old house, four years | 312 00 |
| Gross receipts | $2,742 |

(The old house was occupied by complainant, with his mother, until the last four years.)

EXPENDITURES.

| | |
|---|---:|
| Principal and interest on note.................. | $638 00 |
| Taxes for seventeen years, estimated at $20 | |
| per year................................ | 340 00 |
| Water for seventeeen years, at $18.............. | 306 00 |
| Repairs on both houses ....................... | 130 00 |
| Insurance .................................. | 36 00 |
| | |
| Total expenditures........................ | $1,450 00 |
| This leaves a balance of receipts over expendi- | |
| tures of................................ | $1,292 00 |

It is impossible, from the testimony, to arrive at the amounts with entire accuracy. The complainant's counsel figure $4,500 for board of Mrs. Messier for seventeen years. It was only sixteen years from 1891 to 1907, any way. Further, until the marriage of the complainant, in 1901, his mother not only lived with him in the house, but kept house and did the cooking:

(1)    Contracts for testamentary disposition are allowed to stand only when established by clear proof. *Spencer* v. *Spencer*, 26 R. I. 237.

It being clear that there was no agreement to make a will, the complainant's counsel argue that after the will was made the respondent Messier promised not to revoke it. There was no testimony in this case which had any tendency to show that the respondent Mrs. Messier was under any binding obligation not to revoke her will, unless it was the testimony of the complainant, on page thirteen of the transcript, where he says, in answer to question 99 on the preceding page, that his mother promised him when she made the agreement that she wouldn't break it, and in answer to question 101 he says his mother told him no reasons why she would not break the agreement. Assuming that the complainant means "will" when he says "agreement," and that the word "break" is used to signify

"revoke," there is no consideration shown for any such alleged promise.  In *Edson* v. *Parsons*, 155 N. Y. 555, at p. 568, Judge Gray says,—"A general maxim, which equity recognizes, is that a testator's will is ambulatory until his death.  It is a disposition of property, which neither can, nor is supposed to, take effect until after death.  I think it needs no further argument to show that to attribute to a will the quality of irrevocability demands the most indisputable evidence of the agreement, which is relied upon to change its ambulatory nature, and that presumptions will not, and should not, take the place of proof."

Our conclusion is that the evidence does not show a contract to make a will; that it does not show a contract not to revoke the will; and that it does not show conduct on the part of the respondent Messier which would estop her from revoking the same.

This decision renders it unnecessary to consider the other points raised.

The decree below is reversed, and the cause is remanded to the Superior Court with direction to enter a decree dismissing the bill.

*A. B. Crafts and M. L. Lizotte*, for complainant.

*Felix Hebert, and Vincent, Boss, and Barnefield*, for respondents.