RUSSELL H. PEARSON, *Ex'r vs.* EDITH H. BOZYAN *et al.*

AUGUST 9, 1957.

PRESENT: Condon, Andrews and Paolino, JJ.

PAOLINO, J.   This is a bill in equity brought by the executor of the will of Robert L. Dring, late of the city of Newport, deceased, in his capacity as executor and individually as the sole surviving beneficiary thereunder, to set aside certain gifts purportedly made by the testator to certain of the respondents, and to have the proceeds of such gifts on deposit impressed with a trust in favor of the estate of the decedent.

After a hearing in the superior court on bill, answers, replication and proof, a final decree was entered granting some of the prayers for relief requested by complainant and

denying others. The cause is before us on appeals by both parties, the complainant appealing only from those portions of the decree denying him the relief prayed for and the respondents appealing only from those portions which grant the prayers requested in the bill of complaint.

The testator, who was born in the city of Newport on July 17, 1851, died on December 13, 1953 at the age of 102, unmarried and childless. His will, which is dated February 13, 1948, has been duly probated and complainant, who is a grandnephew of the decedent, is the sole surviving beneficiary and the duly appointed executor under the will.

The complainant, who is fifty-seven years of age, lived at 10 Whitfield Place, Newport, from about 1905 to 1931 when he moved to Belmont, Massachusetts, where he has since lived. The home at Whitfield Place had been owned by members of complainant's family for many years and ultimately he acquired legal ownership thereof by inheritance after the death of his parents and other relatives who had owned the property.

The testator, who at no time had any legal interest in the property, also came to live there in 1905 after the death of his first wife. He continued to reside there with a niece and nephew and complainant's parents until his second marriage in 1920 at which time he and his wife went to live elsewhere. However, upon the death of his second wife in 1940 he went back to the Whitfield Place home and lived there with his niece and nephew and complainant's mother. After complainant's mother died, he continued living there with his niece and nephew.

The testator's nephew died in February 1948, thus leaving only the testator and his niece living in the house at Whitfield Place. He was at this time almost ninety-seven years of age and the niece was also an elderly woman. The complainant testified that up to this time the testator had never contributed to the support and maintenance of the household, although he was financially able to do so having

received an inheritance of $85,000 in 1916. He further testified that he, and his parents before him, had the entire burden of supporting and maintaining the property and household at Whitfield Place during all the years while the testator had been living there.

On February 13, 1948, after the nephew's funeral, complainant had a talk with the testator concerning the carrying on of the household and the expenses incident thereto. He testified that during this conversation the testator discussed his financial situation with him and told him about certain bank accounts which he had in Newport banks; that he gave him the combination of his safe, which contained cash, bankbooks, stock certificates and other personal property; and that the testator showed him a will which he had executed in 1940 leaving his estate to his niece, his nephew and to complainant's mother who was named executrix thereof and who had drawn the will at the request of the testator.

The complainant testified further that during these talks the testator agreed to pay certain household expenses and to execute a will naming him executor, and leaving his estate at his death to his niece and to complainant in appreciation for their having provided a home for him for many years, and in consideration of the promise of complainant to continue to provide a home for him at Whitfield Place to the best of his financial ability as long as the testator lived. He also testified that as a result of these talks and at the request of the testator an attorney was called who, after conferring privately with the testator, drew a will which was duly executed by the testator on the same day; that the testator then told complainant the will had been executed; that testator's niece and he were the sole heirs; and that complainant had been named executor.

The complainant also testified that up to this time he had always been on friendly terms with the testator; that thereafter he corresponded with him; and that, although

he lived about seventy miles away in Belmont, Massachusetts, he visited him as frequently as he could, kept constantly in touch with him, and continued to support and maintain the household. However, the evidence shows that thereafter the testator's good feelings towards complainant began to cool; that they became worse as time went on; and finally that his attitude became openly hostile toward him. There is some evidence that sometime after the will was executed complainant suggested to the testator that it would be better for all concerned if he and his niece would move to smaller quarters, since Whitfield Place was too big for the niece to take care of because of her advanced age and physical condition. This displeased the testator and he accused complainant of trying to put him out of the house. However, he and his niece continued to live there until her death in July, 1953.

At this time the testator was about 102 years of age. After his niece's death there was no one left to take care of him and therefore at the suggestion of complainant and upon the advice of his own physician he was transferred to a nursing home on July 14, 1953. The testator accused complainant of "finally putting him out," and thereafter repeated the same accusation every time complainant visited him. His physical condition during this period was failing, his sight and hearing were bad, he had difficulty walking, and he was also suffering from urinary incontinency and general arteriosclerosis.

It appears from the evidence that during the period between the execution of his will in February 1948 and his admission to the hospital on November 29, 1953 he had made a series of gifts of money and other property to certain of the respondents herein, and also to Arakel H. Bozyan, who died October 26, 1950 and who is not a party in this cause. None of the respondents who were the recipients of said gifts was related to the testator.

It appears from the evidence that the testator, after his

second marriage, had become friendly with Arakel H. Bozyan for whom his wife had worked before her marriage. Mr. Bozyan owned a business known as the Kazanjian Company which was located on Bellevue avenue in the city of Newport and which dealt in antiques, oriental rugs, bric-a-brac and the like. The testator began visiting the company store quite frequently and he and his wife became friendly with the Bozyan family socially. After the death of his second wife in 1940, he visited the store almost daily and would spend hours at a time talking with Mr. Bozyan and other members of his family, particularly his wife Aghavni Bozyan and their children Edith Bozyan, Victoria B. Gordon and Theodore Bozyan, with all of whom he became very friendly. This continued until January 1953 when, because of his physical condition, he could no longer leave his house. Thereafter the Bozyan family visited him almost daily at his home and later at the nursing home and hospital.

The respondent Penelope Chase Bryan was also a recipient of gifts from the testator. The evidence shows that she had known the testator since her childhood and that she and her mother had been friendly with him for many years; that since her childhood and school days she had visited with him at his home at Whitfield Place regularly and frequently; and that she continued this friendship and these visits at the nursing home and also at the hospital.

The gifts, which complainant charges are invalid, were made over a period extending from October 1950 to November 1953. It appears from the evidence that on October 17, 1950 the testator went to the Savings Bank of Newport and withdrew $5,000 from one of his accounts. He then opened an account for $2,500 in the name of Penelope C. Bryan and another account for the same amount in the name of Victoria B. Gordon and he received from the bank passbooks in their respective names.

Penelope C. Bryan testified that on one of her frequent visits to the testator in the latter part of October 1950, he

gave her the passbook in question and said to her: "I want you to have this, it might come in handy sometime * * *." Victoria B. Gordon testified that several days after the death of her father on October 26, 1950 the testator came to the family store for a visit. While there he handed her the passbook in question saying: "I was going to give this to you for Christmas, but after what happened to your father anything can happen and I just think it's better to have it now * * *."

Edith Bozyan testified that on April 16, 1951, on one of the testator's daily visits to the Bozyan store and in the presence of her sister Victoria B. Gordon, the testator took an envelope out of his pocket and handed it to her saying: "I want you to have this. * * * There's $2500 in cash there and I want you to take it down to the Savings Bank and start an account, but I don't want you to do it right away. I want you to keep it. * * * I would do it myself, but I don't want to get down in all that traffic." She also testified that at this time he told her that he had given $2,500 to Victoria B. Gordon and a similar amount to some other person, whom he did not identify. A few days later he told her to deposit the money and accordingly on April 20, 1951 she opened an account for that amount in her name in the Savings Bank of Newport.

Charles E. Livesey, an official of the Savings Bank of Newport, testified that on June 25, 1953 Edith Bozyan came to the bank and stated that the testator wanted to see somebody from the bank at his home; that on that day he went to Whitfield Place where he talked with the testator alone and was told by him that he wanted "to draw $21,000 out of his account and he would like to have three checks made out payable to three different people for $7,000 and he wanted to have those checks credited to these people's accounts in the Savings Bank of Newport." Mr. Livesey testified further that he had no withdrawal slip with him but wrote one out which reads as follows:

"June 25, 1953

To The Savings Bank of Newport
    Gentlemen:
        Draw from my account #50929 the sum of Twenty
one thousand Dollars. Make three checks for $7,000
each to
Penelope C. Bryan
Edith Bozyan
Victoria B. Gordon
                                    [signed] Robert L. Dring
    Witness: [signed] Chas. E. Livesey."
The testator signed the withdrawal slip in the presence of
Mr. Livesey and gave him the bankbook for the account in
question. On the following morning June 26, 1953, Mr.
Livesey made the withdrawal as requested and deposited
the checks to the respective accounts as directed and he
subsequently returned the bankbook to the testator with
the withdrawal of $21,000 noted therein.

It appears from the evidence that the testator had told
Edith Bozyan about this $21,000 transfer on June 24, 1953
when he asked her to have someone from the bank go to
his house. However, it was not until sometime in July 1953
that he told Penelope Bryan and Victoria B. Gordon what
he had done. Mrs. Bryan testified that on July 11, 1953
she was notified by telephone that the testator's niece had
died and she was asked to go to Whitfield Place; that while
there on that day the testator said he wanted to talk to her
alone and he said to her: "* * * I have a gift for you * * *
All the Drings are gone * * * I want you to have Elizabeth's
share of $7,000 * * * and the rest I'm dividing with the Boz-
yan girls." He handed her a small piece of paper with her
name and the figures $7,000 on it and told her to take care
of it as soon as she could. On July 13, 1953 she went to
the bank with the slip of paper and was told that it had
all been taken care of.

Victoria B. Gordon testified she thought it was on July
11, 1953, the day his niece died, that the testator urged her

to go to the bank immediately and take care of the business he had spoken to her about two or three days before, when, she stated, he had said to her: " 'Did you know that I have another gift for you that I want you to take care of?' " As a result of this talk Victoria and her sister Edith went to the bank and the deposits of $7,000 were entered in their bankbooks. They were told at the bank that the testator had made the transfers to their accounts on June 26, 1953.

In the latter part of June 1953 the testator told Edith Bozyan to take anything she wanted from his Dresser street house as he was planning to sell it. The evidence shows that at about this same time he had made arrangements to sell the house to Samuel Raffa for $6,800. At the testator's request, Harry Koehne, an attorney, visited him at Whitfield Place and conferred with him about the details of the sale. Then he prepared a deed which was duly executed by the testator in the presence of his attorney. Subsequently, following instructions, Mr. Koehne delivered the deed to the purchaser's attorney and received a check for the purchase price, less deductions, which he cashed in accordance with the testator's instructions. Thereafter, sometime in the middle of July 1953, he delivered the cash to the testator who was now in the nursing home. Mr. Koehne explained the deductions and adjustments which had been made, had the testator count the money, which amounted to $5,866.62, and requested a receipt for the same, which the testator signed and gave to him. Mr. Koehne testified that on his first visit at Whitfield Place the testator "knew what he wanted about the sale" and told him what he wished done.

All of the above-mentioned gifts were made while the testator was living at Whitfield Place. After his removal to the nursing home on July 14, 1953 he made other purported gifts. On July 17, 1953 he asked complainant to get the keys for his 1937 automobile and on that same day

he gave them to Edith Bozyan and told her he wanted her brother Theodore to have the car and he asked her to give Theodore the keys for the car. Again on July 20, 1953, while Edith Bozyan was visiting him at the nursing home, he gave her an envelope with money in it which he said he wanted her to keep until further instructions. He told her the money was part of the proceeds from the Dresser street sale. In October 1953 he told her he wanted her to keep that money, which amounted to $5,866.62, and do what she wanted with it. He also told her at that time that he wanted her to have all his personal things if he could get them from Whitfield Place.

Edith Bozyan testified that on November 4, 1953, in the presence of Mr. Livesey, the testator gave her a wallet containing $3,200 saying: "Take this. I want you to have it." At the same time he gave her a box with some change in it. The wallet and the box were part of the contents which, she testified, he had asked her and Mr. Livesey to get from his safe at Whitfield Place. After examining other articles which they had taken out of the safe, he kept some and asked them to put the rest of the things back in the safe.

Mr. Livesey, at the testator's request, returned to the nursing home on the following day alone. He testified that the testator told him that "he wanted to do something for the company, that the Bozyan family had been very good to him and that Mr. Bozyan was one of his very best friends and that, as I remember, they had made him president of the company." He testified further that the testator had a bankbook showing a balance of $28,057.52 and that he told Mr. Livesey that he wanted him to make a check for that amount to the company; that he then prepared a withdrawal slip for that amount and the testator signed it and asked him to bring a check for that amount the next day; and that the testator told him that Edith would call for him the next morning.

According to the testimony, on the following morning,

November 6, 1953, Edith, her mother and Mr. Livesey returned to the nursing home. Mr. Livesey gave the testator the check which he had drawn in accordance with his understanding of the testator's instructions to him. It was made payable to A. H. Bozyan Company in the amount of $28,057.52. The testator handed the check to Mrs. Bozyan, in Mr. Livesey's presence, saying: "You take this and keep it." Mrs. Bozyan testified that he then told Mr. Livesey to take the check and put it in the bank for her; that they then went to the bank and opened an account in her name and deposited the check therein; that she returned to the nursing home that afternoon and thanked him for the check; and that he then said to her: "I gave that to you for the store. Mr. Bozyan always wanted to have an emergency fund, but he never got around to doing it and this is for that purpose and keep it and you will see how much it grows, unless there's an emergency, then you use it for the store."

The complainant presented evidence purporting to show an increasing deterioration of the testator's physical condition, especially from 1948 to the time of his death. His physical condition was such that on November 29, 1953 it was necessary to call Dr. Robert Bestoso, who after examining him ordered him transferred to the Newport Hospital where he was again examined by the same doctor. Doctor Bestoso found that he was suffering from urinary incontinence; that he had a very unpleasant odor which was caused by his gangrenous foot; and that he was dirty in appearance. His final diagnosis was "Arteriosclerotic heart disease, arteriosclerotic gangrene of the right foot and senility."

The doctor testified further that the testator's condition of senility was brought on by the arteriosclerosis of the brain and that its effects are felt in the cerebration and ability of the patient to think and to remember particularly recent events; that he was not responsive and had difficulty in ap-

plying himself to the questions asked him; that most of the time he was aware he was in the hospital, but at other times he did not appear to know where he was; and that the condition of the patient, as he found it, was part of the aging process. The doctor testified further that the condition which he described was a slowly progressing process and that there was no question but that the testator was in substantially the same condition on June 1, 1953 as he was when he saw him on November 29, 1953.

On the other hand respondents and witnesses called by them testified that the testator was intelligent and alert during the period when the gifts and transfers were made; that he knew what he was doing at all times; and that he made the gifts of his own free will in appreciation of the friendship which had existed between them for many years.

Upon all the evidence the trial justice found that the testator on February 13, 1948 had entered into a valid contract with complainant "to make a will favoring the complainant" and that the will as executed conformed to the terms of such agreement. However, the court found that such contract "was not an agreement requiring the decedent to leave the complainant the funds in specific deposits in Newport banks."

It is well established that a contract to leave property to another by will must be proved by clear and convincing evidence. *Pohle* v. *McAleer,* 78 R. I. 512, 516; *Tillinghast* v. *Harrop,* 63 R. I. 394; *Messier* v. *Rainville,* 30 R. I. 161; *Spencer* v. *Spencer,* 26 R. I. 237. The issue as to whether or not a valid contract to make a will was entered into by complainant and the testator, as well as the scope thereof, is based substantially on the undisputed testimony of the complainant. This being so, we are in as good a position as the trial justice to draw inferences from such undisputed testimony. *Stiness* v. *Brennan,* 51 R. I. 284, 286. After a careful reading of the transcript we are unable to agree with the findings of the trial justice that there was a valid con-

tract to make a will. In our opinion the complainant has failed to prove such a contract by the clear and convincing evidence required by the above-cited cases.

The main issues in this case relate to the validity of the gifts which we have herein described. The complainant in substance contends that the purported gifts are invalid because the testator was without mental capacity to make the alleged gifts, and further that they were procured by the exercise of undue influence upon the testator by various acts of the respondents. He also contends there was a confidential relationship between the testator and some of the respondents which was abused and taken advantage of by persuasion, fraud and conspiracy on the part of some of the respondents who thus surreptitiously obtained from him property and money without paying due and adequate consideration therefor. The complainant charges that the evidence of the gifts of wine by some of respondents and the fact that the testator told them to keep the gifts secret corroborates his claims of undue influence.

On the contrary, respondents contend that the testator had the mental capacity to make the gifts; that he made them in appreciation of his friendship for them and of their many acts of kindness to him; and that the gifts were made by him of his own free will and without the exercise of undue influence or any other improper or illegal act or acts on their part.

On the question of the validity of the gifts, the trial justice found that sometime between 1950 and November 1953, more particularly at some time after the testator's talk with his attorney Mr. Koehne in June 1953 his mental capacity began to deteriorate and he found that from July 14, 1953 until the time of his death the testator was without mental capacity to dispose of his property by gift; that such of the purported gifts to respondents as were made after July 14, 1953 are invalid; and that the subject matter there-

of ought to be impressed with a trust in favor of the estate of the testator.

Before arriving at this conclusion he discussed in some detail the conflicting evidence which had been presented by both sides on the question of the testator's mental capacity. He stated that much of the evidence presented by the complainant tended to establish a rapidly increasing deterioration of the decedent's physical health from 1948 to 1953, but that respondents had adduced considerable credible testimony that mentally the decedent was intelligent and alert. In addition he reviewed the testimony of Mr. Koehne, the attorney, who in June 1953 handled the sale of the Dresser street house, and he also reviewed the testimony of Dr. Bestoso, who examined the testator on November 29, 1953 and thereafter took care of him in the hospital. He relied on the testimony of these two witnesses in deciding to what extent the evidence sustained the charge of complainant that the testator lacked the mental capacity to make such gifts.

The evidence on the issue of the mental capacity of the testator at the times of the alleged gifts was conflicting. After carefully considering the testimony of Dr. Bestoso, we are of the opinion that it is unreasonable to infer therefrom that the testator became mentally incapacitated on July 14, 1953. However, we are of the opinion that it is not unreasonable to infer from such testimony and other evidence that sometime before his death the testator lacked mental capacity. In our opinion this occurred during the month of October 1953. In any event we are convinced by the testimony of Dr. Bestoso that the testator lacked mental capacity at least for the two-month period preceding his examination of November 29, 1953 to the date of his death and that, therefore, all gifts purportedly made during that period are invalid.

The trial justice found that respondents had sustained the burden of proving that the gifts made prior to July 14,

1953 were not procured by the exercise of undue influence upon the testator. From his findings it is reasonable to assume that he concluded the gifts were made in appreciation of a close friendship of long standing and of the many acts of kindness by the donees to him over the years. On this view we do not differ with such findings, except that we have been unable to find any evidence or to draw any reasonable inferences of undue influence with reference to any of the gifts which were made by the testator prior to the period of two months before November 29, 1953. We have carefully examined the transcript and we cannot say that the decision of the trial justice was clearly wrong or that he misconceived or failed to consider any material evidence on this issue. Nor have we been able to find any direct evidence of specific acts of undue influence. Therefore, we cannot say that he was in error in failing to draw such inferences.

In view of the finding by the trial justice that the respondents have sustained the burden of proving that these gifts were not procured by an exercise of undue influence upon the decedent, we do not deem it necessary to pass upon the question of the existence of a confidential relationship between the testator and any of the respondents. But assuming, without deciding, that such a relationship did exist, we find sufficient evidence in the record to sustain the finding of the trial justice on this issue. See *Colangelo* v. *Colangelo,* 46 R. I. 138, 140.

The complainant also argued that the fact that no independent advice was furnished to the testator is a strong factor negativing the gifts in question. We cannot agree with that contention, since we have not found any evidence in the instant record tending to show that the testator was dependent for advice or direction from any of the respondents during the time when the gifts in question were made. See *Graziano* v. *Graziano,* 81 R. I. 215, 222.

The appeals of both the complainant and the respondents

are denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Sheffield & Harvey, W. Ward Harvey, Richard B. Sheffield,* for complainant.

*Corcoran, Peckham & Hayes, Edward J. Corcoran, Edward B. Corcoran,* for respondents.