JOHN R. REYNOLDS *vs*. THOMAS E. MARSDEN *Ex*.

FEBRUARY 14, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

BAKER, J. This is an appeal from a decree of the probate court of the city of Cranston admitting to probate the will of Sarah E. Reynolds. In the superior court, the trial justice directed the jury to return a verdict sustaining the will;

and the case is before us solely on appellant's exception to the decision granting the motion for a directed verdict.

The appellant is the husband of the testatrix and the appellee is her son by a former marriage, and her only child. The will in question was executed in Providence on January 28, 1931. By its terms it leaves her entire estate of upwards of $35,000 to her son, the appellee, and makes no reference of any kind to her husband, the appellant. The testatrix died on July 7, 1935 at the age of eighty-two.

The record herein shows that the testatrix and the appellant, who was nine years younger than his wife, were married in 1892, it being the second marriage for both parties. At this time neither of them had money. Later, the testatrix inherited about $2800 from members of her family, which money she kept for herself. During the forty-three years while she was married to the appellant, she performed no work, other than her household duties.

The appellant, after being employed for a few years as a mechanic, established and operated a box factory, and from the profits of this business he acquired real estate, the title to which he put in the names of himself and wife as joint tenants. The income from this property, which is unencumbered, is approximately $60 a month. When the factory was destroyed by fire in 1922, the appellant retired from active business, and he and his wife lived on the income from this property and from his savings.

The evidence shows that relations between the husband and wife were good. Except for occasional instances of jealousy on the part of the wife, who did not like her husband to pay attention to any other woman, whether stranger or relative, and an occasional reference by her to his use of liquor, lest it injure his health, they enjoyed a normal, happy life together. There was no evidence introduced of any real impropriety on the part of the husband in either of the above respects. He turned over to his wife from $15 to $25 a week and paid substantially all other household expenses, including the hiring of extra help whenever she so desired, and she

ran the house under this arrangement to his satisfaction. Also, he gave her money and some shares of stock on at least two occasions. She apparently was of a saving disposition and secretive as to her financial affairs.

The appellee, who was about twenty-one years of age when his mother married the appellant, did not live with her thereafter. However, his relations with them both were friendly and cordial throughout their married life. The appellee was successful in business and apparently became quite wealthy.

According to the evidence for the appellant, the health of the testatrix was good until 1927 or 1928, when she had a fall, causing a head injury which confined her to her bed for some time. Later, she lost the sight of one eye and gradually became more feeble, taciturn, and indifferent in her general attitude toward life.

In January 1931 the appellant, with his wife's approval, went to Bermuda for a short vacation, she saying to one of the witnesses that he had worked hard and deserved it. While he was away on this trip, the will in question was executed in the office of George C. Clinton, a member of this bar, to which place the testatrix was taken by the appellee, according to the lawyer's testimony. He testified that he had known the appellee for a number of years and, at various times, had acted as his attorney; that he did not know the testatrix prior to her coming to his office; and that the appellee introduced her to him, saying that she wanted to talk with him, whereupon "she turned to her son and smiled," and he, the attorney, without asking what she wished to discuss with him, asked the appellee to come back in half an hour; that the testatrix first requested him to draw a will leaving $50 to the appellant, and the rest of her estate to the appellee; but that she then directed him to strike out the legacy to the appellant and leave everything to the appellee; that he asked the testatrix no questions about her property or family relations, but merely made a rough draft of what she desired and asked her to return in

a day or two to execute the will; and that the testatrix shortly thereafter left his office with the appellee.

This witness further testified that the testatrix returned to his office as agreed; that, on this occasion, his impression was that she came alone; that she looked over the will and apparently read it and that he was not called upon to either read or explain it to her, and upon her saying that it was all right, the will was then executed; and that shortly thereafter she left, taking the will with her. He stated that he was under the impression that no one was with her when she left his office, although he could not be definitely sure of this fact.

From the evidence, it would appear that the testatrix thereafter made no mention to her husband or to anyone else, of having made a will. In fact, one of appellant's witnesses, who had known the testatrix for over forty years and who had been on friendly terms with her until she died, testified that within three years of her death the testatrix had told her that she had not made a will. From appellant's testimony it appeared that, in various conversations between himself and the appellee during the testatrix's last illness, the appellee stated that he did not know anything about his mother's affairs.

Shortly after the death of the testatrix, the appellant consulted his attorney, Miss Sawyer, respecting his wife's estate. She testified that he told her that to his knowledge his wife had not made a will, but as he had with him keys to a safe deposit box in a bank, and a rent receipt for the box in her name, they went together to the bank to see if the box contained a will. It then appeared that the box had stood in the joint names of the testatrix and the appellee since 1920. The bank records showed that the testatrix had always been present when the box was opened, but did not show whether the appellee had been with her at any of such times.

In answer to a telephone call from the appellant, the appellee came to the bank and was tendered the above keys,

which he refused to accept, saying that he knew nothing of his mother's affairs and that he preferred not to handle the box at all. The attorney thereupon obtained the box, and the three went into a private room to open it and examine its contents, and the attorney then found the will at the bottom of the box underneath other papers and articles. What followed immediately after she had read the will aloud, at the request of both men, is best shown by the following question and answer from the testimony of Miss Sawyer. Q. "Was there any comment made by anyone when you finished reading the will?" A. "Mr. Reynolds said: 'She didn't mention my name?' Then he asked who drew the will and before I could reply, Mr. Marsden replied 'Mr. Clinton.'"

Miss Sawyer also testified that when she handed the will to the appellee he asked her to act for him, although she had never represented him before; that the appellant, who seemed dazed as the will was read, said that he had no objection if it was his wife's will; and that all three then returned to her office where the appellant and the appellee signed a waiver of notice preparatory to probating the will. Within an hour the appellant telephoned her and asked her to do nothing about the waiver of notice, which he had just signed, until she heard from him, as he could not believe that his wife had made that will.

Miss Sawyer further testified that on July 15, 1935 the appellant informed her that he probably would want her to contest the will. When the appellee came to her office the next day, she explained the situation to him and said that she could not represent him and gave him the will, obtaining his receipt therefor. The relation of attorney and client having been thus terminated, certain conversation relating to the will followed, the material portions of which are as follows. The appellee, according to Miss Sawyer's testimony, told her that he did not know how his mother happened to go to Mr. Clinton's office; that the appellee's daughter had gone to Mr. Clinton's office with the testatrix

when the will was signed; that what he knew of the will he had learned from his daughter; that his mother had been a hard-working woman all her life and had lived in humble circumstances; that she was much upset because her husband drank so much and was attentive to other women, referring to one occasion in particular; and that she had said that the money had come to her from her people and that she wanted the appellee to have it. He further told Miss Sawyer that if the appellant would think the matter over he would realize why the will was made as it was; and that "if there was a contest and the case went on it would be a dirty one and he didn't care how dirty it was."

The appellee did not himself give any testimony, nor introduce on his own behalf any evidence, which might have explained satisfactorily such inferences as could reasonably be drawn in the appellant's favor by the jury from the evidence then in the case. On the contrary, at the conclusion of the appellant's evidence the appellee closed his case and moved at once for a directed verdict in his favor on the issue of undue influence, which was the only issue raised on the record. In granting this motion and directing a verdict sustaining the will, the trial justice, as shown by his remarks made at that time, clearly acted on the ground that the will in question was a natural will, but apparently gave no consideration to any of the other facts and circumstances in evidence, then uncontradicted and unexplained, which he was obliged to consider most favorably to the appellant, under our well-established rule, in passing upon the motion to direct a verdict. See *O'Rourke* v. *O'Rourke,* 55 R. I. 367; *Young* v. *Young,* 56 R. I. 401.

The question now before us is whether or not the record shows any legal evidence, direct or indirect, which supports the appellant's claim of undue influence, so as to require the leaving of the decision of that issue to the jury, and not whether undue influence is established by the preponderance of the evidence. This court has defined undue influence in *Talbot* v. *Bridges,* 54 R. I. 337 and in *Walker* v.

*Walker,* 67 A. 519 (R. I.). It is well settled that evidence of opportunity to exercise undue influence, standing alone and unaccompanied by other evidence, either direct or circumstantial, that such influence was exerted, does not warrant the submission of that question to the jury. *Campbell* v. *Rhode Island Hospital Trust Co.,* 125 A. 220 (R. I.); *Di Benedetto* v. *Capone,* 148 A. 184 (R. I.) The last-named authorities are relied on by the appellee in the instant case.

On the other hand, it has been held that: "The elements of undue influence vary so greatly that the presence or absence thereof depends on the particular circumstances of each case." *Caldarone* v. *Caldarone,* 48 R. I. 163, at page 165. It is also well settled that on such a motion as is now before us all evidence in favor of the appellant must be taken as true, and that he is entitled to the benefit of every favorable inference which may reasonably be drawn from the facts in evidence. *Dawley* v. *Congdon,* 42 R. I. 64; *Dart* v. *Rhode Island Hospital Trust Co.,* 45 R. I. 173; *Smith* v. *Smith,* 54 R. I. 402. So considered, facts and inferences, especially if unexplained and uncontradicted, which singly are of slight or different degrees of evidentiary weight, may often in combination furnish sufficient legal evidence of undue influence to require the submission, in the first instance, of that issue to a jury. See *Huebel* v. *Baldwin,* 45 R. I. 40.

The record in the instant case, in our opinion, discloses facts and circumstances which the jury were entitled to consider, and from which they might reasonably draw inferences constituting legal evidence tending to support the charge of undue influence. Without attempting to discuss the evidence in detail, or to specify all such matters, reference may be made to the time of the drawing of the will; to the fact that the testatrix did not mention in the instrument her husband, the appellant, with whom she had lived for about forty years, and toward whom she had expressed affection; to the silence of the testatrix concerning the execution of her will; to her failing health in the latter years

of her life; to the joint holding of the safe deposit box by herself and the appellee; to the possible source of some of her information concerning her husband's alleged conduct which might have displeased her and caused her to draw the will in question; to the testimony of the two attorneys; and to the fact that certain of the appellee's statements to Miss Sawyer concerning the will were contradicted by testimony of other witnesses in the case.

We find, therefore, that on the record before us, the trial justice was in error in directing the jury to return a verdict sustaining the will, and that the issue of undue influence should have been submitted to the jury.

The appellant's exception to the direction of a verdict in favor of the will is sustained, and the case is remitted to the superior court for a new trial.

*Percy W. Gardner, Ada L. Sawyer, Edward W. Day,* for appellant.

*Michael F. Costello, McGovern & Slattery, James A. Higgins,* for appellee.