DECISION
Before this Court is the petition of Jean Lawton ("Plaintiff" or "Ms. Lawton") seeking to nullify a set of inter vivos and testamentary instruments drawn by her mother, Evelyn Z. Foisy ("Mrs. Foisy") to the exclusive benefit of her sister, Joyce Higgins ("Defendant" or "Ms. Higgins"). Plaintiff contends that Mrs. Foisy lacked the requisite mental capacity to execute the documents. Plaintiff further contends that the instruments, described infra, are invalid as the product of fraud, duress, coercion and/or undue influence. Finally, Plaintiff avers that certain inter vivos transfers of cash and property directly to Defendant were wrongful as the product of undue influence. Ms. Higgins opposes all allegations as the beneficiary, trustee, and executor of Mrs. Foisy's estate. Jurisdiction is pursuant to G.L. 1956 § 8-2-17.
 I Facts and Travel
This matter was heard by the Court, sitting without a jury. The following is an overview of the facts in this case. This section addresses the testimony heard and the Court's credibility determinations, and will constitute this Court's findings of fact pursuant to Super. R. Civ. P. 52(a). *Page 2 
Mrs. Foisy was known to be a private woman with good financial acumen and a dry sense of humor. She was married to Arthur E. Foisy ("Mr. Foisy") for many years and was grief stricken upon his death in March 1998. Mr. and Mrs. Foisy executed mirror wills on February 9, 1993, naming one another the beneficiary if living, and dividing all property equally between their two daughters — Plaintiff Jean Lawton and Defendant Joyce Higgins — should the spouse predecease the testator.
On June 2, 1998, Mrs. Foisy granted durable Power of Attorney to Ms. Higgins. Shortly thereafter, Mrs. Foisy executed a trust (the "Trust") to protect her assets. The Trust, which this Court finds to be validly executed, was dated July 16, 1998, and named Mrs. Foisy both Settlor and Trustee.[1] Ms. Higgins was named Substitute Trustee in the event that Mrs. Foisy should become unable to continue in such capacity. Under the original terms of the Trust, the trust corpus was to be used to defray the costs of Mrs. Foisy's last illness, funeral and probate expenses, and the burial plots of her two daughters. The remainder and residue was to be divided as follows: 74% to Ms. Higgins, 20% to Ms. Lawton, 5% to a granddaughter, Melissa Salois, and the remaining 1% to be divided eight ways among eight other grandchildren.
After Mr. Foisy's death in 1998, Defendant began to assist her mother with the management of her financial affairs and medical needs. Ms. Higgins paid the bills, arranged doctors' appointments, and came up from her home in Florida every nine weeks to visit and assist her mother in Rhode Island. On March 22, 1999, Mrs. Foisy amended the Trust to include a provision that would reimburse Ms. Higgins for the sum of her expenses while performing this assistance (airline travel, telephone expenses, automobile rental, lost wages, and other *Page 3 
administrative expenses). After the amendment, the other provisions of the Trust and the division of the residue remained the same. In addition to amending the Trust, on March 22, 1999, Mrs. Foisy executed a new, pour-over will (the "Will"), appointing Ms. Higgins as executor and leaving any remainder after expenses to be added to the Trust.[2]
From March 1999 to 2004, Mrs. Foisy's physical and mental health began to slowly ebb. During this period, she was treated by Dr. Stanley Balon. Mrs. Foisy was diagnosed with degenerative joint disease and possible arthritis in her right knee. These ailments caused her severe episodic pain, swelling, and edema, and limited her mobility. She also began to struggle with moderate dementia and early mild Alzheimer's disease. Dr. Balon's medical reports and trial testimony indicated that Mrs. Foisy had short term memory problems, but that she was aware of her surroundings and able to participate in her health care decisions. This Court finds that Dr. Balon was both candid and credible. Dr. Balon testified that he was Mrs. Foisy's general physician and that his evaluation of Mrs. Foisy's cognitive impairments was quite limited — he had very little to report. This Court does not discredit his testimony, but finds that it provides insufficient support for a conclusion that Mrs. Foisy was mentally incompetent.
In 2003, Dr. Balon recommended that Mrs. Foisy be evaluated by neurologist and Alzheimer's research specialist, Dr. Brian Ott. A report by Dr. Ott in September 2003 indicated that Mrs. Foisy's struggle with dementia, which had begun five years prior, was proven by clinical tests to be increasing in severity. Dr. Ott's report indicated that Mrs. Foisy's daughter (Ms. Higgins) paid the bills and made decisions for her mother, and that a visiting nurse assisted Mrs. Foisy once a week. The report further indicated that Mrs. Foisy, while not hallucinating or suffering psychosis, did become irritable and frustrated with her cognitive impairment. Dr. Ott *Page 4 
indicated in his report that Mrs. Foisy was disoriented as to time, and had difficulty with naming and word finding. Notwithstanding the language in Dr. Ott's medical reports, he was far from persuasive on the stand. Dr. Ott's reports indicated that Mrs. Foisy became uncooperative during one of her medical exams when asked to recognize certain words. Ms. Higgins explained during her trial testimony that Dr. Ott had asked Mrs. Foisy about "frogs," and that Mrs. Foisy, a woman of French national origin, took the reference to be a derogatory comment and insult. Mrs. Foisy was offended and refused to cooperate. The Court, while accepting that this reference was not intentionally derogatory, finds that Mrs. Foisy responded to a perceived insult by becoming uncooperative and that this response supports an inference that she was very much aware of her surroundings and interactions. This Court finds that Dr. Ott misinterpreted Mrs. Foisy's reaction to his insensitive, condescending, and insulting question. Her reaction, given her French heritage and pride therein, was appropriate, and illustrates a degree of mental acuteness which certainly does not suggest a severe cognitive impairment. Furthermore, on cross-examination, Dr. Ott stated that the test he used to determine Mrs. Foisy's level of Alzheimer `s disease was a clinical dimension rating test. He agreed that such tests have, at least at times, been noted in medical journals for lacking reliability. He further agreed that to produce accurate reports, such tests require patient cooperation. Dr. Ott testified inconsistently with his report, stating that he believed Mrs. Foisy was cooperative during his test administration and that he would have known if she were angry or intentionally obstructing proper administration of the test. It is apparent to this Court that Mrs. Foisy's frustration and intentional uncooperativeness was either lost on Dr. Ott, or else ignored by him as he gave his trial testimony. Dr. Ott's testimony lacked credibility and insight, and his report and diagnosis are unreliable and insufficient to support a finding that Mrs. Foisy was incompetent. *Page 5 
Mrs. Foisy's slowly progressing dementia was noted by her siblings, as well as by her physicians. At trial, this Court heard the testimony of Mrs. Foisy's sister, Delia Bettencourt, and her sister-in-law, Cecile Sousy. Mrs. Foisy's brother, Charles Picard, did not testify at trial, but his deposition testimony was read into the record. All three indicated that they believed Mrs. Foisy was afraid of Ms. Higgins, and that she was being forced to move to Florida against her will. They further indicated that Mrs. Foisy's mental condition was deteriorating — she suffered memory loss and confusion — and that she was becoming ever more isolated from her family. These family members testified as to one time or another when they learned of some change in Mrs. Foisy's condition (i.e. a brief hospitalization) by chance, and they felt that Ms. Higgins intentionally excluded them from these developments in order to isolate Mrs. Foisy. The Court finds, however, that these minor matters referred to were the private matters of a very private person, and Ms. Higgins' decision to honor her mother's wishes and protect her privacy was appropriate, and certainly in her mother's best interest. This Court finds that these family members were embittered by a sense of exclusion. They believed they were entitled to know Mrs. Foisy's private matters, and presumed too readily that without Ms. Higgins' interference, Mrs. Foisy would be willing to share these matters with them. The Court discredits these testimonies as the product of family resentment, and finds that these witnesses saw Mrs. Foisy too infrequently and knew far too little of her affairs to testify credibly as to her mental condition.
On February 2, 2004, Ms. Higgins became Mrs. Foisy's primary caregiver under a Care Agreement signed by Ms. Higgins and Mrs. Foisy. The Care Agreement established that Ms. Higgins would provide room, board, and services such as meals, housekeeping, and personal assistance. In return, Mrs. Foisy would pay monthly care fees and rent. The Care Agreement *Page 6 
was witnessed by Mrs. Foisy's attorney, Vincent Mitchell, and is found by this Court to be a valid contract. In general, a "valid contract must be the result of `a meeting of the minds of the parties in mutual assent to the terms of the agreement, must be `sufficiently definite,' and must be `based upon a sufficient consideration'. . . . consideration consists of `either a benefit to the party promising or a prejudice or trouble to the party to whom the promise is made.'" Deangelis v. Deangelis,923 A.2d 1274, 1279 (R.I. 2007) (citations omitted). This Court has reviewed the Care Agreement, and finds that its terms are sufficiently definite: the contract delineates the specific services that Ms. Higgins would perform in exchange for a specified amount of rent from Mrs. Foisy.
The Court also relies upon Attorney Mitchell's testimony. Attorney Mitchell, whose practice consists of 90% elder law and estate planning, testified that he met with Mrs. Foisy alone, having asked Ms Higgins to wait in another room. He took notes regarding Mrs. Foisy's capacity and competency, and he explained the documents that Mrs. Foisy indicated she wished to execute. He discussed with Mrs. Foisy her bills, her frustration at her physical limitations, and her reliance on Ms. Higgins. Attorney Mitchell testified at trial that he found Mrs. Foisy able to understand the contract, as well as consideration for the contract; she knew that she was giving up something in exchange for something else. He further testified that her eyes "lit up" at the idea of establishing this contract, and that she said it was exactly the type of thing she was looking for. Based upon Attorney Mitchell's testimony, this Court is satisfied that the Care Agreement was valid.
On the same day that Ms. Higgins and Mrs. Foisy executed the Care Agreement, Mrs. Foisy also executed a second amendment to the Trust. The Trust as finally amended, which this Court finds was validly executed, was dated February 22, 2004. In order to execute or amend a *Page 7 
trust, the settlor must have testamentary capacity. Restatement (Third)Trusts, § 11 (2003).[3] As with the Care Agreement, Attorney Mitchell stated that he found Mrs. Foisy fully competent to execute the instrument, that she understood and intended its terms, which supports testamentary capacity,[4] and signed it with her own pen. The Trust amendment revoked all previous portions of the Trust with respect to property distribution and replaced those terms with clauses that provided each of the two daughters one double burial plot near their father. The residue and remainder of the Trust Estate was granted entirely to Ms. Higgins, if then living, and to her living issue should she predecease Mrs. Foisy. The final terms of the Trust provided only a burial plot to Plaintiff. This Court finds credible and compelling Attorney Mitchell's testimony as to Mrs. Foisy's intent, her ability to understand the instrument, her independent act of signing the instrument with her own pen, and her acknowledgement to Attorney Mitchell, when meeting with him outside the company of Ms. Higgins, and that she signed it of her own free will. The Court, therefore, finds that the requirements to validly execute the Trust Amendment were met.
Finally, on June 14, 2004, Mrs. Foisy executed a quitclaim deed transferring her real property from the Trust to herself, and a second deed transferring her real property to Ms. Higgins, reserving a life estate for herself (collectively the "Deeds"). The Deeds were also prepared by Attorney Vincent Mitchell. Attorney Mitchell testified at trial that in order to transfer an interest in property, the transferor must understand the nature of the property and that he or she is transferring that property with donative intent, or for consideration.See Wetherill v. *Page 8 Moore, 73 R.I. 140, 143 (R.I. 1947) (to be competent to execute the deed, the transferor must understand and appreciate the nature and character of such deeds); Chase v. Chase, 20 R.I. 202, 203 (R.I. 1897) (a transferor must have "sufficient mental capacity to understand the nature and consequence of his act in giving the deed . . ."). He found Mrs. Foisy competent to execute these instruments.
As with the Care Agreement and amended Trust, Attorney Mitchell testified that Mrs. Foisy understood the Deeds and their effect, signed it with her own pen, and wrote him a check for his services from her own checkbook. He asked her specifically whether she was being coerced, and he asked her questions regarding her finances; all of which she was able to answer with ease. Attorney Mitchell noted that asking an elderly person about his or her personal bills and finances is often the best indicator of that person's competency. He noted that an elderly person may find it troublesome to keep track of times and dates (which are often tested in medical exams), as his or her retirement and physical constraints may render days very similar. However, he testified that in his experience, elderly persons who are mentally capable frequently know the details of their expenses. Attorney Mitchell testified that Mrs. Foisy was able to quote every one of her bills to the specific dollar amount. Because of his credible testimony as to his own capacity determinations and his extensive experience in elder law issues, this Court places considerable weight upon Mr. Mitchell's assessments of competency.
Mrs. Foisy died on March 20, 2005. Upon her death, all of her property and assets, except one double burial plot, were transferred to Ms. Higgins. Ms. Lawton, resentful of this distribution, brought suit in Probate Court. The case is before this Court on appeal. In addition to the testimony of Mrs. Foisy's two treating physicians and three family members, this Court also heard from Plaintiff and Defendant at trial. Plaintiff's testimony revealed that she had very *Page 9 
little contact with her mother and that her involvement in her mother's life in her mother's later years was scant. At trial, Plaintiff made global assertions regarding the unfairness of her mother's testamentary distribution. She made general accusations as to the influence her sister allegedly unduly exerted. The Court finds that Plaintiff's testimony utterly failed to support these general accusations. The Court further finds that Plaintiff was angry by her mother's decision, and that her testimony was driven by her resentment toward her sister.
As outlined supra, Defendant began supporting her mother after her father's death in 1998, and her role substantially increased between 1999 and 2005. Ms. Higgins became Mrs. Foisy's primary caregiver, and was, in the Court's opinion, precise and meticulous to a fault in this role. Defendant was a profoundly credible witness. She knew every nuance of her mother's finances and medical care, and was unshakeable in her testimony as she was cross-examined regarding expenses, withdrawals, medical appointments, and other paperwork. Defendant kept her own independent record of every single transaction she made on behalf of her mother and could speak with clarity as to her recollection of each event during her mother's ailing years. Her record keeping was flawless. She could account for every cent, and she had receipts and cancelled checks for every single transaction, however minor. There was nothing forthcoming under cross-examination that could dent her extremely credible testimony. This Court finds that all transfers of cash to Defendant during this period of time were for the care of Mrs. Foisy and were properly applied to legitimate expenses.
The Plaintiff contends that Mrs. Foisy lacked the requisite mental capacity to execute the Trust, the amendments to the Trust, the Second Will, the Deeds, and the Care Agreement (collectively the "Instruments"). She further contends that the Instruments were invalid as the result of fraud, duress, coercion, and/or undue influence. Defendant counters that the absence of *Page 10 
a particular witness, Joyce Pelletier of the Department of Elderly Affairs, should be held against the Plaintiff under the empty-chair doctrine. Defendant asserts that because Plaintiff represented that Ms. Pelletier's testimony would support the claims of coercion and duress, and because Plaintiff subsequently failed to call this witness, the Court should draw an inference that Ms. Pelletier's testimony would have been adverse to the Plaintiff's case. Defendant further contends that the assertions with respect to invalidity are false and that the instruments represent the true intentions of Mrs. Foisy.
 II Standard of Review
The Rhode Island General Laws provide that "[a]ny person aggrieved by an order or decree of a probate court . . . may, unless provisions be made to the contrary, appeal to the superior court." G.L. 1956 §33-23-1(a). In hearing probate appeals, "the Superior Court is not a court of review of assigned errors of the probate judge, but is rather a court for retrial of the case de novo." In re Estate of Paroda,845 A.2d 1012, 1017 (R.I. 2004); G.L. 1956 § 33-23-1(d).
In a non-jury trial, the standard of review is governed by Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure. The Rule provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." Accordingly, the "trial justice sits as the trier of fact as well as of law." Hood v. Hawkins, 478 A.2d 181,184 (R.I. 1984). It is the province of the trial justice, when sitting without a jury, to weigh and consider the evidence, pass upon the credibility of the witnesses, and draw inferences from the testimony presented. See id. The assessments of the trial justice "traditionally [accord] a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot *Page 11 
be grasped from a reading of a cold record." In the Matter of theDissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006).
The trial justice must make specific findings of fact and conclusions of law; however, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. LeClerc, 468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. 52(a). The Rhode Island Supreme Court has found that these findings generally "will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong."Greensleeves, Inc. v. Smiley, 942 A.2d 284, 289 (R.I. 2007).
 III Analysis
The legal issues before this Court are whether Mrs. Foisy possessed the requisite mental capacity to execute the Instruments in question; whether such Instruments are invalid as the product of fraud, duress, or coercion; and whether the Instruments are invalid as the product of undue influence. The testator's mental capacity is a prerequisite to drawing valid inter vivos and testamentary instruments. See Pearson v.Bozyan, 86 R.I. 311, 324-325 (R.I. 1957) (finding that gifts made after the testator lost his mental capacity were per se invalid, and so plaintiffs need not prove undue influence for those instruments). Therefore, this Court will first address the issue of whether Mrs. Foisy's possessed the requisite mental capacity.
 A Testamentary Capacity
In a will contest, the proponent of the will bears the burden of proving, by a preponderance of the evidence, that the testator had the requisite mental capacity to execute the *Page 12 
instrument. Pollard v. Hastings, 862 A.2d 770, 777 (R.I. 2004). Generally, a fair preponderance requires that the facts be shown to more likely than not support the proponent's conclusion. Perry v.Alessi, 890 A.2d 463, 469 (R.I. 2006). To show that the testator possessed such capacity at the time of the instrument's execution, the proponent must demonstrate that the testator:
 "[1] has sufficient mind and memory to understand the nature of the business he is engaged in when making his will[; 2] has a recollection of the property he wishes to dispose of thereby[; 3] knows and recalls the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, [and] their necessities[;] and [4] the manner in which he wishes to distribute his property among them." Pollard, 862 A.2d at 777 (quoting Rynn v. Rynn, 55 R.I. 310, 321, 181 A. 289, 294 (1935)).
This test does not require that the testator have full knowledge or understanding of the will's contents, and the testator's eccentricities, peculiarities, or fixed notions of family and financial matters will not render him or her incapable of making a will. Bajakian v. Erinakes,880 A.2d 843, 852-853 (R.I. 2005).[5]
In the present matter, Plaintiff contends that the testimony of Mrs. Foisy's two treating physicians and the testimony of Mrs. Foisy's siblings and sister-in-law provide overwhelming and uncontroverted evidence of Mrs. Foisy's lack of capacity. This Court disagrees. Nothing could be further from the truth. While Dr. Balon's testimony indicated that Mrs. Foisy suffered from progressive moderate dementia, his reports and testimony reflected an absence of any indicia even suggesting that she had reached such a stage as to be incapable of recalling her property or the natural objects of her bounty. See Pollard,862 A.2d at 777. In fact, the reports indicate that while she was disoriented as to time and had short-term memory loss, she was *Page 13 
aware of her surroundings and generally understood her finances. Dr. Balon also candidly agreed that his testing of Mrs. Foisy's cognitive functioning was too limited to make a conclusive determination regarding her mental capacity.
Dr. Ott testified that Mrs. Foisy retained only highly learned material and that she became frustrated with her cognitive limitations. This Court has found that Dr. Ott's test results provide unpersuasive evidence of Mrs. Foisy's cognitive limitations, as it was clear that sheintentionally ceased to cooperate. Plaintiff additionally points to the testimony of Mrs. Foisy's siblings and sister-in-law. However, the Court finds the family's indication that Mrs. Foisy was disoriented and confused in her later years unpersuasive. Their contact with her was minimal. Furthermore, among other evidence, the Court viewed a family video taken shortly before Mrs. Foisy's death, in which she interacted in an appropriate and involved manner with her family and was a cognizant participant in the events. She would wave and look to the camera when asked, and was clearly engaged and appropriately responsive during the outing. Finally, the Court credits the testimony of Mrs. Foisy's attorney that he evaluated Mrs. Foisy's capacity before drafting the later documents and that in his professional opinion, she was capable of executing these instruments. As described supra, Attorney Mitchell found Mrs. Foisy able to enumerate her own bills, to fully understand the purpose and effect of the instruments he prepared, to agree fully that she was acting of her own will, to sign the documents with her own pen, and to write her attorney a check from her own personal account. Based upon Attorney Mitchell's testimony, Mrs. Foisy knew and intended to execute these instruments, and she fully understood the extent of her property.
While the Court finds credible the testimony that Mrs. Foisy struggled with dementia and Alzheimer's disease, the Court does not find that her lack of short term memory or inability to *Page 14 
orient herself with respect to time influenced her drafting of the testamentary instruments. If "an insane delusion does not deprive a testator of the capacity to make a will," certainly the natural forgetfulness brought on by the ailments of age will not deprive Mrs. Foisy of this right. See Rynn v. Rynn, 55 R.I. 310, 322 (R.I. 1935).
The Court finds that the Defendant has demonstrated by a preponderance of the evidence that Mrs. Foisy knew that she was drafting the Instruments; that she knew her property and the natural objects of the disposition; and that she recalled her relationship with and treatment by those people. See Pollard, 862 A.2d at 777. In fact, the very distribution at issue evidences Mrs. Foisy's awareness of the treatment she received from the natural objects of her testamentary distribution: she bequeathed the greatest amount to the family member with whom she enjoyed the most time and upon whom she depended the most in her time of need. Ms. Higgins was the ultimate, positive caregiver, and a truly devoted daughter. For these reasons, this Court concludes that Mrs. Foisy possessed the requisite capacity to execute the Instruments.
 B Fraud, Coercion, Duress and Defendant's Empty ChairDoctrine
In her complaint, Plaintiff averred that Mrs. Foisy executed the Instruments as a result of Defendant's fraud, coercion, duress, and/or undue influence. Plaintiff's post-trial memorandum focuses solely on the claim of undue influence. For that reason, and because the Plaintiff failed to present evidence as to the fraud, coercion, and duress claims, this Court will address these claims only briefly.
Although the lines distinguishing the legal theories of fraud, coercion, duress, and undue influence are often blurred, they are distinct in some senses. See 1 Page on the Law of Wills § 14.3 (1960); 25 Am. Jur. 2d Duress § 2 (2004). Fraud is defined as "[a] knowing *Page 15 
misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." Pleasant Mgmt., LLC v.Carrasco, 918 A.2d 213, 219 n. 8 (R.I. 2007). Fraud is distinguished from coercion or duress because in fraud cases, the injury is accomplished without the victim's knowledge. See 1 Page on the Law of Wills § 14.3 (1960); 25 Am. Jur. 2d Duress § 2 at 448 (2004). In the instant matter, Plaintiff has come forth with mere allegations, and nothing more, that Ms. Higgins made misrepresentations to Mrs. Foisy in order to induce the testamentary distribution. She has proffered no evidence in support of this claim. In a civil case, the Plaintiff must prove fraud by a fair preponderance of the evidence. Ostalkiewicz v. Guardian Alarm, Div. ofColbert's Sec. Servs., 520 A.2d 563, 569 (R.I. 1987). Plaintiff in the instant matter has failed totally in meeting this burden, and, therefore, the Court finds that Plaintiff's fraud claim fails.
In the context of contracts, coercion has been discussed as a "hold up game," where one party forces the action of another by refusing to complete his or her work. See Angel v. Murray, 113 R.I. 482, 491 (R.I. 1974). Plaintiff has, again, proffered no evidence to suggest that Ms. Higgins threatened to cease caring for her mother in order to procure a favorable bequeathal. Although the terms of the amended Trust and Care Agreement evidence Mrs. Foisy's desire to reimburse Ms. Higgins for the cost of her care, these terms in no way support an inference that such an exchange was forced. Even if there had been proof that Mrs. Foisy objected to some of the terms of the Instruments, her signing the Instruments over such objection would not constitute coercion. SeeDaniels v. Aharonian, 63 R.I. 282, 295 (R.I. 1939) (a wife, asked by her husband to sign a will, strongly objected to the provision made for her daughter; the Court found that these circumstances did not provide evidence that she had been coerced). In coercion cases, the finder of fact must be "satisfied by a preponderance of the evidence that influence was used *Page 16 
such as to amount to force. . . ." Young v. Young, 56 R.I. 401, 408
(R.I. 1936). This Court, sitting as fact finder, finds that this standard has not been met. Even if Plaintiff's evidence could support a finding of influence, which will be discussed infra, there was no evidence to show that any such influence amounted to force. See id.
Duress is perhaps most closely akin to undue influence but has been described as an extreme form. 25 Am. Jur. 2d Duress § 2 (2004). The Rhode Island Supreme Court has defined duress as "a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes the person to do an act . . . not of his or her own volition." Notarantonio v.Notarantonio, 941 A.2d 138, 147 (R.I. 2008). Duress has also been defined as "that degree of constraint or danger either actually inflicted or threatened and impending which is sufficient in severity or in apprehension to overcome the mind and will of a person with ordinary firmness." Bennett v. Bennett, 433 A.2d 968, 971 (R.I. 1981). These definitions connote severe pressure that would destroy the agency of even an ordinary person. Plaintiff has proffered no evidence to demonstrate that Defendant's acts or words could cause such confining pressure. Plaintiff's assertions relate to Mrs. Foisy's weakened condition and Ms. Higgins' opportunity to influence her as her sole caretaker and holder of Power of Attorney. Even if Ms. Lawton were to prove these facts, she has not presented evidence that would raise the claim to the level of duress. In fact, there was absolutely no evidence whatsoever to support this claim.
In addition to denying the claims of fraud, coercion, and duress, Defendant contends that an adverse inference should be drawn against Plaintiff regarding the alleged intervention of Joyce Pelletier of the Department of Elderly Affairs. Plaintiff suggested that Ms. Pelletier would testify that she intervened to protect Mrs. Foisy from Ms. Higgins. This testimony was intended *Page 17 
to support Ms. Lawton's claims of coercion and duress. Ms. Pelletier was not called to testify. Defendant contends that this Court should assume such testimony would have been harmful to Plaintiff's case.
Under the empty-chair doctrine, "a litigant's unexplained failure to produce an available witness who would be expected to give material testimony in [sic] the litigant's behalf permits, but does not compel, a factfinder to draw an inference that had the witness testified, the testimony would have been adverse to the litigant." Ret. Bd. of theEmples. Ret. Sys. of R.I. v. DiPrete, 845 A.2d 270, 294 (R.I. 2004) (quoting Belanger v. Cross, 488 A.2d 410, 412-13 (R.I. 1985)). The Rhode Island Supreme Court has instructed trial justices to apply this discretion with great caution and to be sure that the missing witness was indeed available before any negative inference is drawn.Id. In the instant matter, Defendant argues that Ms. Pelletier was available, and the fact that no report of the alleged incident was made provides support for an inference adverse to the Plaintiff.[6] This Court finds that the allegations of abuse intervention are indeed discredited by the lack of supporting evidence, including the absence of Ms. Pelletier's testimony. However, because the testimony would presumably support the claims of duress and coercion, and because this Court has found insufficient evidence to support such claims, there is no need to draw an additional inference adverse to the Plaintiff.
 C Undue Influence
The remaining issue before this Court is whether the Instruments were invalid as the product of undue influence. "Undue influence long has been recognized in equity as a defense to or a means of challenging the validity of a will, deed, or contract. . . . In such cases, equity *Page 18 
provides an action for restitution or rescission to cure the dominant party's wrongful `substitution of [his or her will] for the free will and choice [of the subservient party].'" Lavoie v. N.E. Knitting,Inc., 918 2d 225, 229 (R.I. 2007) (citing Filippi v. Filippi,818 A.2d 608, 630 (R.I. 2003); Tinney v. Tinney, 770 A.2d 420, 435 (R.I. 2001);Caranci v. Howard, 708 A.2d 1321, 1322 (R.I. 1998)).
There is no set checklist for a trial justice to follow in determining whether an instrument is the product of undue influence.Tinney, 770 A.2d at 438. Such a set of principles has been intentionally avoided by the Rhode Island Supreme Court, "lest the very definition itself should furnish a guide to the path by which its consequences may be evaded." Id. (quoting 23 Am. Jur. Deeds (Undue Influence) § 203 (1983)). The Court is, instead, charged with considering the totality of circumstances and may evaluate such factors as (1) the existence of a fiduciary relationship or a relationship of trust and confidence; (2) the opportunity to exert influence; (3) the disposition, acts, and declarations of the person allegedly exerting influence; (4) susceptibility of the testator to influence, such as failing physical or mental condition; and (5) unnatural disposition of the will. SeeCaranci, 708 A.2d at 1324; see also Notarantonio v. Notarantonio,941 A.2d 138, 147 (R.I. 2008) (citing Filippi, 818 A.2d at 630;Tinney, 770 A.2d at 438, finding that "a trial justice ordinarily examines the totality of the circumstances, including the relationship between the parties, the physical and mental condition of the grantor, the opportunity and disposition of a person wielding influence, and his or her acts and declarations").
These factors may be considered for each of the Instruments for which Plaintiff has alleged undue influence. However, the standard of proof for establishing undue influence differs based upon whether the instrument was inter vivos or testamentary. 25 Am. Jur. 2d Duress andUndue Influence § 47 (2006) (stating that the majority rule provides that a "lower standard of *Page 19 
proof of undue influence is required for wills and a higher one for contracts. . . ."). This Court will address the Instruments in turn.[7]
 1 The Inter Vivos Instruments
Three of the Instruments at issue were executed and effective during Mrs. Foisy's lifetime: the Deeds, the Care Agreement, and the Trust and Trust Amendments. To prove that a deed or contract is invalid as the product of undue influence, the party challenging the conveyance must prove undue influence by "clear and convincing" evidence. SeeTinney, 770 A.2d at 440 (establishing the standard with respect to deeds); Filippi, 818 A.2d at 630 (relating this standard to contracts). This general standard is altered, however, when the beneficiary of the deed or contract enjoys a relationship of trust and confidence with the grantor. Passarelli v. Passarelli, 94 R.I. 157, 159-160, 179 A.2d 330,332 (1962). The Court in Passarelli stated that "[o]rdinarily, one who seeks the cancellation of an instrument bears the burden of establishing his right thereto by clear and convincing evidence. . . . However, where a relationship of trust and confidence exists between grantor and grantee, it is generally held that the burden is on the grantee to establish [by clear and convincing evidence] that the transaction was fair, proper, and reasonable in all circumstances." Id. This burden-shifting standard arises from the rationale that when a beneficiary of an instrument enjoyed a relationship of trust with the grantor, then "[t]he circumstances are suspicious and . . . [call] for some explanation." Kerr v. McKenna, 57 R.I. 252, 255, 189 A. 408, 409
(1937). *Page 20 
In order to apply the Passarelli standard, this Court must first determine whether there existed a relationship of trust and confidence between Ms. Higgins, the beneficiary of Deeds and Care Agreement, and Mrs. Foisy. Here, there was a clear fiduciary relationship as a result of the Power of Attorney, and the content of the Care Agreement itself implicitly indicates that a relationship of dependence and trust existed between Ms. Higgins and her mother. See Passarelli, 94 R.I. at 160-161,179 A.2d at 332 (stating that there must be more to the relationship of trust that a mere parent-child relationship, but that where property is conveyed in consideration of a promise of maintenance and support by the child, then the relationship reaches the fiduciary level and the burden-shifting standard applies). Therefore, this Court will apply thePassarelli standard to the Deeds and Care Agreement.
This Court is satisfied that Ms. Higgins has proven by clear and convincing evidence that the transactions in question were fair, proper, and reasonable. See Passarelli, 94 R.I. at 159-160, 179 A.2d at 332. The Care Agreement, which was executed on February 2, 2004, delineated the terms under which Ms. Higgins would provide for her mother and accept a small payment for rent and expenses. The Court has reviewed the terms of the Care Agreement, and has heard the testimony of Ms. Higgins as to its effect. Having found Ms. Higgins' testimony extremely credible, the Court finds that she intended and indeed thoroughly fulfilled her obligation under the Care Agreement. The Court is further satisfied that the terms of the Care Agreement were fair at the time of execution; it provides for complete care by Ms. Higgins in exchange for a modest rent and expenses. See Zaino v. Zaino, 818 A.2d 630, 637 (R.I. 2003) (an agreement between family members is a valid contract if it is reasonable and fair, and not the product of coercion, fraud, or undue influence) (citations omitted). Finally, the Court gives weight to the testimony of Attorney Vincent Mitchell, who drafted the Care Agreement and testified that he *Page 21 
found Mrs. Foisy to fully understand and intend to be bound by the terms of the contract. See Weaver v. Am. Power Conversion Corp., 863 A.2d 193,198 (R.I. 2004) (stating "for parties to form a valid contract, each must have the intent to be bound by the terms of the agreement"). Therefore, this Court finds that Ms. Higgins has met her burden, and the Care Agreement was valid.
The Deeds, which transferred Mrs. Foisy's real property from the Trust to herself, and then from herself to Ms. Higgins, were executed in June 2004, a short time after the Care Agreement which established Mrs. Foisy's dependency on her daughter. It is clear to this Court that the Deeds were executed in order to protect the property that Mrs. Foisy was no longer able to maintain. The fact that she transferred this property in its entirety to Ms. Higgins was both reasonable and fair: it was Ms. Higgins who had aided Mrs. Foisy in maintaining that property for the years of Mrs. Foisy's illness, and Mrs. Foisy was no longer in need of that property, as she resided with Ms. Higgins. As discussedsupra, Attorney Mitchell testified that Mrs. Foisy was of sound mind and fully aware of the effect of this transfer at the time the Deeds were executed. See Neisler v. Pearsall, 22 R.I. 367, 371-372 (R.I. 1901) (requiring that the testator understand and intend the effect of the deed in order for it to hold power of sale). This Court, therefore, finds that Ms. Higgins has met her burden, and the Deeds are valid.
The final inter vivos Instrument at issue is the Trust dated July 16, 1998. The Trust — initially granting 74% of Mrs. Foisy's assets to Defendant and 20% to Plaintiff — was amended twice. The first amendment, executed on March 22, 1999, maintained the original distribution of the residue, but added a provision to reimburse Ms. Higgins for her continuing aid. The second amendment, executed on February 2, 2004, revoked all previous distributions and granted all residue and remainder of the Trust Estate, save one double burial plot, to Defendant. *Page 22 
Although a trust is fundamentally different from a deed or contract, a revocable trust and amendments to that trust are treated as inter-vivos transfers in the context of undue influence. Filippi, 818 A.2d at 629
(distinguishing inter vivos trust instruments from bequeathals by will).[8] Even where a trust, as in the case here, is entirely funded by a pour-over will, it is not deemed testamentary in nature, and a non-will standard applies. Id. A trust is, therefore, more comparable to other inter vivos transfers, such as contracts and deeds. See id. The Rhode Island Supreme Court has approved the use of a heightened clear and convincing standard of proof where such inter vivos instruments are sought to be revoked for undue influence. See Tinney, 770 A.2d at 440
(applying this standard to a deed); C.f. Caranci, 708 A.2d at 1324
(establishing that in order to challenge a will's validity, the plaintiff must establish undue influence by the preponderance of the evidence); see also 25 Am. Jur. 2d Duress and Undue Influence § 47 (2006).
Because the Rhode Island Supreme Court has related inter vivos trusts to deeds and contracts, and because the Passarelli burden-shifting standard applies to such instruments, this Court will consider the Trust under this standard. See Filippi, 818 A.2d at 629.[9] The Trust *Page 23 
amendments offer a window through which the Court can see the development of Mrs. Foisy's relationships. The first amendment in 1999 maintained the distribution of the remainder of the Trust, but accounted for Ms. Higgins' aid. It is clear to this Court that the amendment sought to repay Ms. Higgins for Mrs. Foisy's increasing dependency on her. By 2004, when the second amendment was executed, Mrs. Foisy was entirely dependent on her caregiver daughter, and had lost substantial contact with Ms. Lawton, who played a minor, if any, role in her care. It is Ms. Higgins' burden to show that this final Trust was fair, proper, and reasonable. See Passarelli, 94 R.I. at 159-160,179 A.2d at 332.
It is universally accepted that the law jealously guards the testator's right to dispose of his or her property as he or she sees fit. See e.g., Woods v. Commonwealth, 142 S.W.3d 24, 57 (Ky. 2004). It is not the prerogative of this Court to decide whether the final distribution outlined in the Trust was fair in global terms. Considering the evidence — the profoundly credible testimony of Ms. Higgins regarding her relationship with and care of her mother, and the careful and precise testimony of Attorney Mitchell who drafted the Trust amendments and found Mrs. Foisy mentally capable and fully aware of the effect of her distribution — this Court concludes that there existed clear and convincing evidence that the Trust with its Amendments was fair and reasonable. See Passarelli, 94 R.I. at 159-160,179 A.2d at 332.
Even assuming, arguendo, that the Passarelli standard did not apply to the amended Trust, this Court's determination would remain the same. Were this Court to treat the Trust under the testamentary standard, Ms. Lawton would bear the burden of proving undue influence by a preponderance of the evidence. Caranci, 708 A.2d 1321 (R.I. 1998). Because this Court has found that Ms. Higgins has proven by the higher clear and convincing standard that the *Page 24 
amended Trust was fair and reasonable, it follows that Ms. Lawton would be unable to show by a preponderance of the evidence that the same Trust was the product of undue influence. Axiom aside, this Court has found that Ms. Lawton has failed to provide even a scintilla of evidence to support her assertion; clearly failing any burden of proof that may applied to a trust.
 2 The Will
Plaintiff contends that the Will, executed March 22, 1999, is invalid as the product of undue influence.[10] The standard for determining undue influence with respect to wills differs from the standard for inter vivos instruments. See 25 Am. Jur. 2d Duress and UndueInfluence § 47 (2006). The standard for wills is clearly stated in the Rhode Island case Caranci v. Howard, 708 A.2d 1321 (R.I. 1998) (the testator was an elderly woman who bequeathed her entire estate to a friend she had met in her final years). There, the Court found that a party contesting a will bears the burden of proving undue influence by "a preponderance of the evidence." Id. This standard imposes a lower burden than the "clear and convincing" standard which has been applied to contracts, deeds, and inter vivos trusts. See Tinney,770 A.2d at 440; Filippi, 818 A.2d at 629, 630. Because the treatment of wills generally differs from the treatment of inter vivos instruments, and because the Rhode Island Supreme Court has not extended the heightened standard of proof to wills, the Passarelli burden-shifting rule does not apply. Because the act of coercion is often accomplished in secret, the will contester may rely on circumstantial evidence *Page 25 
to meet the preponderance of the evidence standard. Id. at 1324. However, such evidence must amount to more than mere "suspicion, surmise, or conjecture." Id. at 1327. In the instant matter, nothing beyond mere surmise has been presented.
The Court has considered several factors for determining undue influence. See Caranci, 708 A.2d at 1324; Notarantonio, 941 A.2d at 147. This Court accepts the testimony of Mrs. Foisy's treating physicians that she suffered from moderate dementia and Alzheimer's disease, as well as physical ailments that weakened her condition. While Mrs. Foisy's weakened condition may have made her more susceptible to influence, this Court has found that she had sufficient testamentary capacity and was a woman of sufficiently strong will to resist such influence if any had existed. This Court finds that no such influence existed. See Caranci, 708 A.2d at 1324; Notarantonio, 941 A.2d at 147
(susceptibility to influence is one possible factor for consideration in finding undue influence). It is true that Ms. Higgins served as Mrs. Foisy's sole caretaker, held Power of Attorney, and controlled Mrs. Foisy's finances. While this evidence clearly establishes a relationship of trust in which Ms. Higgins had the opportunity to exert influence, this Court finds no evidence beyond the existence of opportunity to support a finding of undue influence. See Caranci, 708 A.2d at 1324;Reynolds v. Marsden, 60 R.I. 91, 97, 197 A. 193, 196 (1938) (finding that the opportunity to exert influence, without a showing that impermissible influence was, in fact, applied, is insufficient for a finding of undue influence).
This Court has found incredible Plaintiff's testimony that Ms. Higgins exerted pressure on Mrs. Foisy to favor her in the distribution of property. The Court has further discredited the testimony of Mrs. Foisy's siblings and sister-in-law that Ms. Higgins sought to isolate Mrs. Foisy and eliminate contact with the family. In addition, this Court finds that the generous bequeathal to a caretaker child is not an unnatural disposition of property. See Caranci, 708 A.2d at 1324, *Page 26 
1328. Finally, having fully accepted Ms. Higgins' testimony that she considered her mother's best interest in all decisions made on her behalf, this Court is satisfied that no undue influence was exerted upon Mrs. Foisy to accomplish the Will. Viewing the totality of the circumstances, this Court concludes that Plaintiff has failed to show undue influence by a preponderance of the evidence. Therefore, the Second Will is valid and remains in effect. Plaintiff has made global assertions against Defendant to defeat her mother's last wishes. These assertions are found to be wholly without basis and reek of "sour grapes."
 IV Conclusion and Judgments of Law
Pursuant to Super. R. Civ. P. 58, this Court enters the following judgments:
 1. All inter vivos transfers of cash from Mrs. Foisy to Ms. Higgins are declared legitmate and lawful.
 2. The Trust executed July 16, 1998, and amended on March 22, 1999, and February 2, 2004 is declared valid, with the final amendment effective.
 3. The Deeds dated June 14, 2004, conveying Mrs. Foisy's real property from the Trust to herself and from herself to Ms. Higgins are declared valid.
 4. The Care Agreement executed on February 2, 2004, between Mrs. Foisy and Ms. Higgins, is declared valid and properly fulfilled.
 5. The Will executed March 22, 1999, funding the Trust, is valid and is hereby declared the Last Will and Testament of Evelyn Foisy.
Counsel shall submit the appropriate order for entry.
[1] As a general principle, the validity of a trust relies upon the settlor's intent to create a trust, and his or her actions demonstrating an effort to execute that intent. See Anderson v. Anderson, 41 R.I. 307,314 (1918). In this matter, the parties do not challenge the proper execution of the initial Trust instrument as to form. Ms. Lawton's contentions with respect to Mrs. Foisy's capacity to execute the Trust will be addressed infra.
[2] Because the parties challenge the Trust in its final amended form, it is unnecessary for this Court to determine whether the intermediate amendment was properly executed. It is discussed to provide context for the facts of this case.
[3] At trial, Attorney Mitchell testified that in order to execute a Trust or amendments to it, a person must have the ability to contract. Although the creation of a trust has been favorably viewed as an aspect of contract law, see John H. Langbien, The Contractarian Basis of theLaw of Trusts, 105 Yale L.J. 625, 627 (1995), the Restatement of Trusts regards a settlor's capacity to create a revocable inter vivos trust as equivalent to the capacity required of a testator who is creating a trust by will. Restatement (Third) Trusts, § 11 (2003).
[4] See Pollard, 862 A.2d at 777. The requirements for testamentary capacity — including the testator's ability to understand the business of drawing a testamentary instrument, the testator's recollection of his or her property and the natural recipients of that property, and the testator's recollection of the treatment he or she has received from those likely recipients — will be discussed more thoroughlyinfra.
[5] A similar standard applies to deeds and trusts, and so the instruments will be discussed together under this test. See e.g.Williamson v. Williamson, 90 R.I. 233, 237, 157 A.2d 110, 111-112 (R.I. 1960) (applying the same standard to wills and deeds); Pearson v.Bozyan, 86 R.I. 311, 324, 134 A.2d 387, 393 (R.I. 1957) (discussing mental capacity in the context of a trust).
[6] Under G.L. 1956 § 42-66-8, "[a]ny person who has reasonable cause to believe that any person sixty (60) years of age or older has been abused, neglected, or exploited, or is self-neglecting, shall make an immediate report to the director of the department of elderly affairs or his or her designee. . . ."
[7] The instruments are addressed in the following order: the Care Agreement, the Deeds, the Trust and amendments, and finally the Will. This order organizes the Instruments with respect to their inter vivos or testamentary status, and is not chronological (the chronology of the Instruments is as follows: 1) the Trust, executed July 16, 1998; 2) the 1st amendment to the Trust, executed March 22, 1999; 3) the Will, executed March 22, 1999; 4) the 2nd amendment to the Trust, executed February 2, 2004; 5) the Care Agreement, executed February 2, 2004; 6) the Deeds executed June 14, 2004).
[8] Several other jurisdictions have adhered to this divided treatment of gifts, which provides a separate standard for inter vivos transfers and bequeathals by will. See e.g. Todd v. Todd (In re Estate of Todd),585 N.W.2d 273, 276 (Iowa 1998) (finding that the shifting clear and convincing burden which applied to inter vivos transfers contrasted with the standard that applied to allegations of undue influence in connection with a will); Walton v. Davy, 86 Md. App. 275, 290 (Md. Ct. Spec. App. 1991) (applying the burden-shifting standard to a distribution that could have taken place during the testator's lifetime, finding that the transfer was an inter vivos decision more similar to transferring property by deed than by will); Ennis v. Burnham,159 Mo. 494, 518 (Mo. 1901) (distinguishing the standard applicable to inter vivos contracts from that applicable to wills); but see Fogel v.Swann, 523 So. 2d 1227 (Fla.Dist.Ct.App. 3d Dist. 1988) (the court applied the same standards of undue influence to the inter vivos gifts as were applied to wills). The standard applicable to a trust often depends upon the characteristics of the trust. See e.g. Upman v.Clarke, 359 Md. 32, 48 (Md. 2000) (finding that a trust may be treated as either a testamentary distribution or an inter vivos one, depending upon the nature of the trust; if the donee has immediate access to the trust funds, it is more likely an inter vivos transfer, but a where a trust serves as a will substitute, it is a testamentary transfer). The Rhode Island Supreme Court in Filipi found that inter vivos trusts function as inter vivos gifts generally, even where such a trust is funded by a testamentary instrument. Filippi, 818 A.2d at 629.
[9] The Rhode Island Superior Court has previously applied thePassarelli standard in a case of undue influence where the instrument at issue was a trust. See Larmore v. Fleet Nat'l Bank, 2006 R.I. Super. LEXIS 157. The Court in Larmore noted that the Passarelli standard should not be read to apply to all instruments, but found that the presumption of undue influence which arises under thePassarelli standard should be applied to a trust instrument if the beneficiary stands in a relationship of trust and confidence to the grantor. Id. at *12. The Court in Larmore found that under the facts of that case, the relationship between the parties did not reach the level necessary to invoke the presumption. Id. at *18-19.
[10] There are no remaining challenges to the Second Will with respect to its form. To properly execute a will, the testator must be eighteen years of age and "of sane mind," G.L. 1956 § 33-5-2, and the will must be "in writing and signed by the testator, or by some other person for him or her in his or her presence and by his or her express direction; and this signature shall be made or acknowledged by the testator in the presence of two (2) or more witnesses present at the same time, and the witnesses shall attest and shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary, and no other publication shall be necessary." G.L. 1956 § 33-5-5. Here, the Plaintiff has challenged the Second Will as to the requirement of the testator's sane mind. However, this Court has found that Mrs. Foisy was of sane mind and possessed the requisite testamentary capacity when executing this Will. See Discussion supra. There were no additional challenges. *Page 1